SAN FRANCISCO BREWERIES, Limited, v. BRAINARD.

(Circuit Court of Appeals, Ninth Circuit.    May 1, 1916.)

No. 2620.

MUNICIPAL CORPORATIONS ⬤⟶706(6)—STREETS—INJURIES TO PERSONS—JUDGMENT—EVIDENCE—SUFFICIENCY.

> In an action by one run down by a team of horses, the questions whether the team was in charge of defendant at the time of the injury, it appearing defendant had hired the horses, and whether defendant was guilty of negligence, *held* under the evidence for the jury.
>
> [Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 1518; Dec. Dig. ⬤⟶706(6).]

In Error to the District Court of the United States for the Second Division of the Northern District of California; Wm. C. Van Fleet, Judge.

Action by Sylvia A. Brainard against the San Francisco Breweries, Limited. There was a judgment for plaintiff, and defendant brings error. Affirmed.

H. B. M. Miller and William Rix, both of San Francisco, Cal. (L. M. Hoefler, of San Francisco, Cal., of counsel), for plaintiff in error.

Harrison & Harrison, Richard C. Harrison, Byron F. Stone, Jr., and Stanley Moore, all of San Francisco, Cal., for defendant in error.

Before GILBERT and ROSS, Circuit Judges, and RUDKIN, District Judge.

ROSS, Circuit Judge.   The record in this case shows that the defendant in error, who was plaintiff in the court below, while standing on the sidewalk at the corner of Twentieth street and Broadway, in the city of Oakland, was without fault on her part struck by a team of runaway horses, thrown down, kicked, and trampled upon, thereby sustaining very serious injuries, for which she brought the suit to recover damages against the plaintiff in error.

The record shows that at the time in question the plaintiff in error was operating a brewery known as the John Wieland Brewery, situated on the westerly side of Broadway, between Nineteenth and Twentieth streets, of Oakland, to which premises were two entrances from Broadway, each about 10 feet wide, at the rear of which was a barn.   The team of horses that caused the injuries to the plaintiff was owned by one Thun, from whom the plaintiff in error had hired it for that day.   Thun took the horses to the brewery shortly after 7 o'clock a. m., and left them there in charge of employés of the plaintiff in error, who used them during the day for drawing a wagon of the Brewery Company.   During the afternoon Thun was notified by telephone that the horses would not be needed the following day, and was told to call for them at about half past 5 o'clock in the afternoon, which he accordingly did.

The real questions involved on the trial were:  First, in whose possession or control was the team at the time the horses started to run away? and, secondly, the question of negligence.   The instructions of the trial court to the jury upon those questions were clear and correct, and, in our opinion, covered the case.   It is insisted, however, on the part of the plaintiff in error, that the evidence was practically without substantial conflict that at the time the horses started to run away they were not in the possession or under the control of the defendant, but had theretofore been delivered over to their owner, Thun, in which event the plaintiff in error could not be liable for damages inflicted by them, and, further, that even if the team, at the time of starting to run, was in the possession of the plaintiff in error, the evidence was likewise without substantial conflict that there was no negligence on the part of the latter, and therefore that the court should have taken the case from the jury and directed a verdict in favor of the defendant to the action.

A brief reference to the evidence will readily solve those contentions.   It is undisputed that one Crow, an employé of the plaintiff in error, was the man who drove the team during the day, and upon the completion of his route drove it back to the brewery and left it hitched to the wagon and standing in one of the driveways mentioned, 20 or 30 feet back from the entrance and facing it.   The substance of the testimony of Thun, so far as the points in question are concerned, is that when he rented the team to the Brewery Company he told them "that it was a free team, and I did not like to let everybody have it. They said they would take good care of it.   By free team I mean free team in traveling.   I suppose it was the manager that called me up. I do not know his name.   I know him when I see him.   I took the team over there the next morning at 7 o'clock, and saw the man, I

suppose it was, that was taking care of the barn; I told him about it. I do not know his name. He was the man I saw there taking care of the barn. I told him the team had done nothing for a couple of days, to be a little careful with them, because a team that does not do anything for a couple of days, they are feeling quite full of life, and a person cannot trust them any. He said he would look after that, and I left the team there."

Thum further testified that: When he went to get the team, about half past 5 o'clock in the afternoon, "the team was standing in the yard hooked to the wagon. By the word 'yard' I mean kind of a shed or floor boarded up from the outside. There is a door where they drive in and out through." That when he went in the yard one of the attendants there said, " 'There's your team; hold on, and we will unhitch 'em for you.' Then the driver and me started up toward the wagon, and I started for the office to make a settlement for the day's work, and he started to unhook them, and I started in the doorway, and they started off. * * * It was the driver who said, 'We will unhitch them.' " He further testified that, when he went to the office to get his money, the driver "went on up to the team; that is the last I seen of him until the team started."

The witness further testified, in substance, that when he next saw the driver he was lying on the sidewalk as if he had fallen or been knocked over; that the witness ran after the team, which was going at a full gallop, to the corner of the street at which the plaintiff received her injury, and where the skull of one of the horses was fractured—being about half a block from the doorway of the brewery. The witness also testified: That, when he took the horses to the brewery in the morning, Crow, Cooper, and McKinnon of the brewery were there, but he did not know which one of them took the horses. That he "told the three men that were there to be careful with the horses, because they had not worked for three days, and to watch out a little for them. The three men I saw were the two I have just seen—that is, Mr. Cooper and Mr. McKinnon—and the driver, Mr. Crow; and when I told them that all three of them were together. I handed the lines over to one of them, and they took the horses and hitched them up. I did not stand watching them. I went back to my business." That when he went for them in the afternoon, all three of the men mentioned were there, and that at that time the team was standing about 20 or 30 feet back from the street, with the heads of the horses facing Broadway. That when he went in he asked the men if they were through with the team.

On behalf of the defendant, Crow was called as a witness, and testified on direct examination, among other things, as follows:

"On the 29th day of May, 1914, I was in the employ of the San Francisco Breweries as a driver of a bottling wagon and two horses. I remember the accident that occurred at the premises of the brewery, on the west side of Broadway, between Nineteenth and Twentieth streets, about 5:30 o'clock in the afternoon of May 29, 1914. I was working as a driver for the brewery on that date. I was an extra driver for the brewery, and had worked, I think, about a week at that time, and then before that, maybe, a few days at a time, when they would call me. I continued in their employ for three or four days, I guess, after the accident. I drove the team that caused the acci-

dent. I was present at the brewery on the morning of the 29th day of May, 1914, when the team of horses which I drove on that day were brought there. A man by the name of Thun brought them, I think, about 7:15, or somewhere near that, in the morning. These horses were driven into the brewery premises by Thun, on the south driveway. They were harnessed when he brought them. I asked him if the horses were wild in any way, and he said, 'No; they are free drivers; one of them is a free driver.' Thun, I think, stayed there while Cooper, McKinnon, and myself hitched up the horses; but I am not sure of that. I got back to the brewery, after the day's work, about 4 o'clock in the afternoon. When I got back there there was no further route for me to drive over during the day. I drove into the place where we always unload our empties, and unloaded all of the empties, and went in to cash in with Mr. Walker. I went out and asked the stable man, 'Shall I unhitch them?' and he said, 'No; they have already telephoned us that the gentleman was coming after his team.' I put them at the platform where we always load up, at the same place that we drive them in, and left them standing there. That was the platform nearest Broadway. * * * When I stopped the wagon and the horses there I put on the brake and tied the lines up. There were no rings on the lines. When I drove into the brewery I set my brakes, and there were no rings on the lines, and there is a rail on the back of the seat. I just tied a loop right there with the lines, like you would tie a bowknot and put the lines through, and pulled them through like this (illustrating). The brakes were set. The lines were pulled back about the same as the rings would set them, pretty tight. I was on the platform next to the icehouse, over where they keep the keg of beer. It is just this side of the stable. The platform I refer to is the one on the diagram (Defendant's Exhibit A) shown as adjoining the stable. It is designated on the diagram as 'Loading Platform.' I was there alone until Mr. Thun came in. He came up and sat down on the platform alongside of me. Cooper and McKinnon were working on the horse, that had a nail in its foot. They were right at the doorway of the barn or stable. When Thun came up, he said something about his team, and Cooper said, 'They are waiting in the driveway,' or something to that effect. Thun and I talked possibly five minutes, and then he said, 'All right, I will take my team.' I said, 'All right, I have been driving them all day, and I will come and help you unhitch them.' He then started off ahead of me toward the team, and I followed up behind him. He possibly was three paces ahead of me. He went on the left-hand side of the wagon, and I went on the right-hand side, and he walked from this platform, and I went on the right. There is no platform there, just a gangway there; and all at once the horses started to go, and I made a jump on the step and grabbed for the lines, and I caught one line, and they dragged me through the doorway. I suppose I went through a space of about two feet there, and they dragged me onto the curb, and I had to let go; I had only one line. I could not tell where Thun was at that time. He was on the other side of the wagon, and I could not tell. Just as I got to the step there was something started them. Then I made a grab for the lines and jumped on the step to get hold of the line. The brake was still on, and the lines were still fast. I got only one line. I hung onto the line to the curb, about 50 feet. The horses were right at the curb, right on Broadway there, when I dropped the lines. The reason I dropped it was I could not hold on any longer. They were turning to the left, and they would run over me, and I had to let go of the lines, they hurt me as it was."

## On cross-examination the witness testified, among other things:

"When the team was brought in there that morning, Cooper told me that, as this is a strange team, I had better chain the wagon. I asked Mr. Thun if the horses were all right, and he said that one horse was a little bit bad about his head or something. He said one of them was a free horse. He referred to the one on the left-hand side; it had a halter on it. Q. Had you noticed during the day that that horse was unusually free? A. Yes; up until possibly I had reached Elmhurst. After that he was quiet. Q. Did you ever state that you knew that horse was a free horse, and that, in fact, he had several times during the day tried to run away from you? A. Only in the

morning he was. He may not have tried it, but it appeared that way to me. He was a good free horse; he was right' on the bit all the time.   Q. Did you tell Mr. Thun that night, when he came in there, that the horse was a good free horse, and had been on the bit all day?   A. I could not tell you whether I did or not.   Q. Is not it a fact that you told him they were a good team, and had been on the bit all day?   A. I don't remember if I did.   Q. Do you remember his asking you how you got along with the team?   A. I do not.   Q. Is not it a fact that you stated to Inspector Hodgkins that the left horse of the team was a bad horse?   A. After he had run away, I might have; yes.   Q. Did not you say to him, further, he tried several times during the day to run away?   A. In the morning I do not know if he tried to run away; but, as I said before, he was a good free horse; he would have gone if you had let him go.   Q. Whether he was a good free horse or not, did you make the statement to the inspector on June 6th that he was a bad horse, and that he tried several times during the day to run away?   A. I may have made that statement; yes, up till that time in the morning."

Enough has been quoted from the testimony, we think, to show that the case was plainly one for the jury to determine the two questions of fact upon which the rights and liabilities of the respective parties depended.

The judgment is affirmed.

---

☾☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes